**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PATRICIA L. QUINONES,          )   Case No. CV 06-2366-PHX-MHM
                               )
            Plaintiff,         )   **ORDER**
                               )
vs.                            )
                               )
JOHN E. POTTER, Postmaster General, )
United States Postal Service,  )
                               )
            Defendant.         )
                               )
_____)

Currently before the Court is Defendant John E. Potter's Motion for Summary Judgment. (Dkt. #49). After reviewing the pleadings and determining that oral argument is unnecessary, the Court issues the following order.

**I.    BACKGROUND**

In November 1995, the United States Postal Service ("Postal Service") hired Patricia Quinones ("Plaintiff") as a mail processing clerk in the Phoenix General Mail Facility ("Phoenix GMF"). (Plaintiff's Controverting Statement of Facts ("PCSOF") ¶¶ 1, 83-85; Defendant's Objections to PCSOF ("DO"), Exh. A, p.3). Mail processing clerks perform "a variety of clerk duties required to process mail using automated mail processing equipment or manual methods of sortation and distribution." (PCSOF ¶¶ 83-85; Exh. 43).

On April 19, 1996, Plaintiff underwent an operation to remove axillary tissue beneath her arms. (DO, Exh. A, p.3). During the operation, Plaintiff suffered nerve

damage, causing both a loss of range of motion and pain whenever Plaintiff reached her
arms above her shoulders. (Id.). As a result, both the surgeon and Plaintiff's personal
physician, Dr. Patricia Mitchum, imposed temporary work restrictions on Plaintiff: no
lifting over 20 pounds and no reaching and lifting above shoulder height; with a predicted
return to full, unrestricted work on May 26, 1996. (Id.). Plaintiff submitted her medical
documentation and recommendation to the Postal Service's Health Unit and requested
that she be placed on temporary light duty. (Id.; PCSOF 2). A Postal Service physician,
Dr. Charles Grose, subsequently adopted Plaintiff's reported restrictions, and the Postal
Service approved Plaintiff's request to be assigned to temporary light duty ("TLD"). (Id.;
PCSOF ¶¶ 2, 16, 32).

Despite physical therapy, Plaintiff's condition persisted past the projected date for
her return to unrestricted work. (DO, Exh. A, p.3). Plaintiff requested – and was
continued on – TLD for the remainder of 1996 and into 1997. (Id., pp. 3-4; Plaintiff's
Response to Defendant's Objections to PCSOF ("PR"), pp. 2-3). However, on April 28,
1997, after Dr. Mitchum requested yet another extension for Plaintiff to remain on TLD,
stating that although Plaintiff "has recovered full range of motion, [she] continues with
sharp shooting pains on occasion," Dr. Grose noted that Plaintiff's work restrictions had
lasted for more than one year and thus classified her condition as permanent. (PCSOF ¶
4; DO, Exh. A, pp. 4-5). As a result, Dr. Grose informed Plaintiff that she must request
permanent, as opposed to temporary, light duty. (DO, Exh. A, p.5). Plaintiff did not
make such a request, and on May 14, 1997, the Postal Service informed Plaintiff that they
were going to terminate her employment because she "no longer [met] the requirements
of the position of Mail Processor for which [she] was hired." (PCSOF ¶ 5; DO, Exh. A,
p.2, Exh. B).

Plaintiff did not apply for disability retirement. (DO, Exh. A, p.6). Instead, she
filed a union grievance and challenged her removal, contending that "the only medical
evidence relied upon by [Dr.] Grose was that proved by [Plaintiff's] own doctors, which
[showed] that [Plaintiff's] condition was temporary." (Id., p.7). In September 1997,

while awaiting arbitration, Plaintiff obtained employment with an outside employer; and by approximately January 1998, Plaintiff had "completely recovered from her condition." (Id.). Plaintiff submitted documentation from her then-physician, Dr. John Koryakos, which stated that Plaintiff had recovered from her condition and was released to full-time work status without any restrictions. (Id.).

On July 2, 1999, the Arbitrator concluded that "[Plaintiff's] removal was not for just cause" (DO, Exh. A, p.1): The Postal Service's removal decision "did not have a medical basis for stating that [Plaintiff's] condition was permanent, or for declining to maintain her on TLD," because "the medical evidence strongly indicated that a return to work was not only possible but likely." (Id., p.13). Plaintiff was awarded immediate reinstatement with full back pay and benefits, less outside earnings, and without loss of seniority. (Id., p.1; PCSOF ¶ 6).

Phoenix GMF documentation dated October 6, 1999, notes that "[e]mployee has permanent restrictions since 4/28/97. No lifting over 20 lbs. No overhead reaching, lifting. No standing & doing repetitive flexion & extension of her head." (PCSOF, Exh. 5). It appears that Plaintiff returned to work "with restriction. No heavy lifting until pain is gone." (Id.).

In September 2000, Dr. David Bailie treated Plaintiff for "[n]eck pain and posterior scapular pain [in her] left shoulder." (PCSOF, Exh. 6, p.1). Upon examination, Dr. Bailie noted that Plaintiff was a "[w]ell developed, well nourished female in no acute distress." (Id., p.2). He also noted that Plaintiff "ha[d] limited range of motion of the neck in all plains" and "complains of pain," but "full range of motion" with "diffuse mild weakness" in her shoulders. (Id.). Dr. Bailie referred Plaintiff to Dr. Christopher Huston, a neck specialist, and stated that he was unable to determine whether Plaintiff's condition was work-related or because Plaintiff "is near six foot and has fairly extensive breast size which does cause significant postural problems for her." (Id.).

Upon her referral, Dr. Huston, diagnosed Plaintiff with cervical spondylosis, a disorder caused by abnormal wear on the cartilage and bones of the neck. (PCSOF, Exh.

7; DO, p.3). Based on Dr. Huston's recommendation, the Postal Service placed Plaintiff on TLD with the following restrictions: "no work with neck in flexion position over 5 minutes at a time," and "no overhead activity." (PCSOF, Exh. 8). The Postal Service continued Plaintiff's TLD assignment based on Plaintiff's February and March 2001 follow-up visits to Dr. Huston, with an initial added restriction of "no sitting or standing over 30 minutes at a time" (id., Exhs. 9, 10), followed by a change of restriction to "no neck flexion [and] no lifting over 25 lbs. May stand for 6 ½ hrs at a time." (Id., Exhs. 11, 12).

In March 2001, Dr. Bailie diagnosed Plaintiff with "[o]veruse syndrome bilateral upper extremeties with bicipital tenosynovitis" and "occupational bursitis," and recommended that Plaintiff enter a body conditioning program. (PCSOF, Exh. 14, p.2). However, Dr. Bailie also noted that Plaintiff "recently had chin liposuction and therefore part of her exam is going to be limited because of some soreness around the neck." (Id.). As a result of Dr. Bailie's recommendations, the Postal Service continued Plaintiff's TLD assignment with the added restriction of "no repetitive lifting / bending over 25 lbs." (Id., Exhs. 16, 17).

In August 2001, based on a recommendation from Rehab Arizona, the Postal Service noted that Plaintiff could "work 40 hrs/week. May work up to 3 hrs per day doing regular loading/sweeping[;] the rest of the day light duty. Limit 40 [lbs] lifting." (PCSOF, Exh. 19). Then, in September 2001, the Postal Service continued Plaintiff's TLD assignment with the recommended restrictions of "4 hrs/shift loading/sweeping" and "4 hrs. sitting activity (non - standing). Limit lifting/carrying/pushing/pulling not over 40 [lbs]." (Id., Exh. 21). Plaintiff's TLD placement was continued into 2002. (Id., Exhs. 22, 23).

On September 18, 2002, Ron Heller, a supervisor, changed Plaintiff's work shift from 3:00 p.m. through 11:30 p.m. to 7:00 p.m. through 3:30 a.m. (PCSOF ¶ 29). In addition, on October 28, 2002, Denise Brown, another supervisor, assigned Plaintiff to a

seat in her work area (id. ¶ 30), at which time she "was not allowed interaction with other employees." (Id. ¶ 31).

On December 16, 2002, Plaintiff began seeing Dr. Jeffrey Levine, who noted that Plaintiff apparently "had longstanding problems with respect to her neck and both upper extremities, as a consequence of work related repetitive activities." (PCSOF, Exh. 26, p.1). Dr. Levine also noted that Plaintiff only has one functioning kidney, and as a result, refrained from using antiinflammatory or like medications to relieve pain. (Id.). However, Dr. Levine noted that Plaintiff was "in no apparent distress" and " has a full range of motion of the neck. There is some tenderness with hyperextension and flexion. . . . Shoulder exams are benign. A full range of motion is noted." (Id., p.2). Dr. Levine concluded that "[Plaintiff] has classic signs and symptoms of a soft tissue type injury to the upper extremities" and diagnosed Plaintiff with "bilateral myofascial pan syndrome of the neck and shoulders"; but he was unable to determine whether Plaintiff's injury was due to work activities. (Id., p.3). Dr. Levine started Plaintiff on medication to "rid her of her neck and shoulder pain," and he released her to full work with restrictions.[1] (PCSOF, Exh. 27).

As a result of his December 16, 2002 examination, Dr. Levine recommend that Plaintiff be continued on TLD and placed on the following restrictions: "Lift/carry to 10 lbs 2 hrs/day intermittent. Sitting/standing/walking/climb stairs continuously. Kneeling, bending, stooping, twisting, simple grasp and fine manipulation, continuously; push / pull 30 minutes/day. Reach above shoulders 30 min/day." (PCSOF Exh. 28). The Postal Service, however, apparently "placed [Plaintiff] on a 2 hour per day work day, . . . . [and]

---

[1]Apparently during this time Plaintiff was on a leave of absence, "and as a consequence of her relatively quiescent lifestyle, while not at work, her pain dramatically improved." (PCSOF, Exh. 26, p.1). It also appears that Plaintiff filed a "workman's compensation claim" with the United States Department of Labor, but that claim was rejected. (Id.).

refused to allow [her] back to work, on an 8 hour per day shift, prior to being reassessed by [Dr. Levine]." (Id., Exh. 30, p.1).

In January 2003, Dr. Levine reexamined Plaintiff. (Id.). At that time, Plaintiff stated that she was "completely asymptomatic" and "eager to return to 8 hours per day in a modified capacity." (Id.). Dr. Levine again noted that Plaintiff was "in no apparent distress" and that she "exhibit[ed] a full range of motion of the neck . . . . both shoulders, elbows, and wrists." (Id.). However, Dr. Levine accepted Plaintiff's contention that "there is an occupational etiology for her present symptoms" and recommended a "return to 8 hours per day work with [an additional restriction of] only 1-10 pounds of lifting required. She should also refrain from repetitive overhead use of both upper extremities." (Id., p.3; PCSOF, Exh. 31).

Dr. Levine examined Plaintiff again in February 2003, noting that while "[Plaintiff] brought in a detailed history describing all of her work activities, which would strongly suggest that the development of her current soft tissue type symptoms were generated by repetitive activities at work, . . . . [she] has thus far failed to respond to any means of reasonable treatment other than the avoidance of specific work activities." (PCSOF, Exh. 32, p.1). Dr. Levine again found that Plaintiff was in no apparent distress and had a full range of motion of her neck and shoulders (id., pp. 1-2), but concluded that

> [Plaintiff's] development of recurrent symptoms is on the basis of a
> repetitive motion disorder. This is exemplified by the fact that when
> [Plaintiff] stops her current job type, as when on vacation, all of her
> symptoms abate. In this sense, I believe that her current condition is
> occupationally related, and as such, opine that her condition should be
> accepted by the United States Department of Labor. The patient was
> advised that the only true means of permanently alleviating her symptoms
> would be to change her job type with the postal service. I would suggest a
> more sedentary type job without repetitive use of the upper extremities. . . .
> A clerical job would probably be ideal.

(Id., p.2). Nonetheless, Dr. Levine opined that Plaintiff could return full time to the Postal Service with restrictions of "lifting less than 10 pounds at a dead lift, and 5 pounds repetitively, and the avoidance of strenuous pushing or pulling with either upper extremity" (id.), with an unknown anticipated date for return to full duty. (Id., Exh. 33).

On April 21, 2004, Dr. Levine examined Plaintiff for "a new injury to the right shoulder and neck [that Plaintiff sustained] when she fell at work on 3-2-04." (PCSOF, Exh. 42, p.1). Dr. Levine noted that Plaintiff recently had her gallbladder removed and was "scheduled for a breast reduction which should help with chronic back pain." (Id.). Dr. Levine also noted that "[Plaintiff] demonstrates a full range of motion of the neck . . . . [and] the right [and left] shoulder" (id.), and recommended additional physical therapy: "Modalities and strengthening can be used to improve [Plaintiff's] situation." (Id., p.2). The work restrictions imposed by Dr. Levine in February 2003 remained unchanged. (Id., Exh. 36).

Plaintiff contends that in May 2003, another Postal Service employee requested that Plaintiff be moved into a data entry position and have her start time changed. (PCSOF, Exh. 1 ("Plaintiff's Affidavit") ¶ 13). A March 4, 2004 "Limited Duty Assignment", which reflects a "date of injury" of March 2, 2004, indicates that Plaintiff was moved to a data entry position beginning on March 9, 2004 with work hours of 3:00 p.m. to 11:30 p.m. (DO, Exh. C).

On August 10, 2004, the Postal Service made Plaintiff an Offer of Modified Assignment (Limited Duty) with works hours from 7:00 p.m. to 2:30 a.m., and the same off days (Mon.-Tues.). (PCSOF, Exh. 37). Plaintiff signed the offer that same day. (Id.). In addition, Plaintiff and the Postal Service subsequently presented the modified position to Dr. Levine, who "advised [them] that the job offer was within [Plaintiff's] restrictions." (Defendant's Statement of Facts ("DSOF"), Exh. K, p.3; DSOF, Exh. B ¶¶ 10, 11).

However, Plaintiff states that she was sent home in August 2004 after the Postal Service informed her that they had no more work for her within her medical restrictions. (PCSOF ¶ 58). A February 2006 Postal Inspector Investigative Memorandum,[2] on the

---

[2]Plaintiff moves to strike the 2006 Investigative Memorandum as lacking foundation, unduly prejudicial under Fed.R.Evid. 403, and containing improper character evidence under Fed.R.Evid. 404(a). (Dkt. #52, pp. 17-20). The memorandum, however, appears to constitute a business record, and is thus admissible under Fed.R.Evid. 803. And the

other hand, indicates that "[Plaintiff] stopped working on August 28, 2004. [Plaintiff] claimed neck and shoulder pain, medication and Postal Service job offer, was not within her restrictions." (DSOF, Exh. B ¶ 12). Plaintiff applied to the Arizona Department of Economic Security ("DES") for state unemployment insurance on August 24, 2004, because she was "under the impression she was laid off[.]" (PCSOF ¶ 59; DSOF, Exh. F, p.2).

On September 29, 2004, the Postal Service sent Plaintiff another offer of a permanent modified position as a mail processing clerk, with work hours from 7:00 p.m. to 2:50 a.m., and the same off days (Mon-Tues). (Id., Exh. 38). However, Plaintiff did not accept the job offer, and she did not return to work between August 2004 and August 2005. (PCSOF ¶ 66). Instead, Plaintiff filed a union grievance, arguing that the Postal Service's August 2004 modified job offer "failed to accommodate [Plaintiff] within her restrictions," and that "[Plaintiff] was not allowed to consult her Doctor concerning her restrictions with a modified job offer she signed dated 8-10-04 and 8-16-04." (DSOF, Exh. L, p.1).

On March 23, 2005, Plaintiff was examined by a Dr. Letellier, who subsequently released Plaintiff to full-time work. (DSOF, Exh. F, p.3). And on March 30, 2005, without examining Plaintiff, Dr. Levine reported that "[w]hen taking into consideration Dr. Letellier's evaluation and my previous impressions of [Plaintiff's] condition, I am now going to release [Plaintiff] to full time duties at work without restriction." (PCSOF, Exh. 39). Dr. Levine also cancelled a surgery that had been scheduled for Plaintiff. (Id.).

---

declaration of Diana Cahill, the Postal Inspector who prepared the report, provides adequate foundation. In addition, the Court does not find that the memorandum in its entirety – and especially those portions mentioned in this order – is unfairly prejudicial. See Old Chief v. U.S., 519 U.S. 172, 179 n.4 (1997) (courts may consider the relevant section of a document and disregard other portions). Finally, the memorandum does not appear to contain inadmissible character evidence; but regardless, the Court will not consider the memorandum in the instant order to the extent that it draws any conclusions about Plaintiff's character or her activity related therein.

But on June 22, 2005, Dr. Levine reexamined Plaintiff and remarked that "[Plaintiff's] symptoms have markedly worsened since last being assessed[.]" (PCSOF, Exh. 40, p.1). Dr. Levine also noted that "Dr. Letellier is now of the opinion that [Plaintiff] does have evidence of a cervical radiculopathy in addition to discogenic neck pain[,]" and that "[Plaintiff] has decreased range of motion of the neck with marked pain" and "ongoing restricted motion due to pain" in both shoulders. (Id., pp. 1-2). As a result, Dr. Levine "placed [Plaintiff] back in a light duties position as she cannot perform her regular duties as previously dictated." (Id., p.2). Dr. Levine also, having "gone over [Plaintiff's] work descriptions as provided by her union representative[,]" concluded that "[Plaintiff] is incapable of returning to work in her previous job as in fact she does have to perform lifting which is in excess of the 20 lb. lifting restrictions that [were] previously described." (Id.).

Then, on July 27, 2005, Plaintiff met with Dr. Levine to discuss "whether [she] could have performed jobs, as described in a work description, as of 2004[,]" in which "[Plaintiff] had to gaze downwards for a prolonged period of time, and . . . . lift heavy objects." (PCSOF, Exh. 41). Dr. Levine opined that "the job description, as presented to [him], negated the patient's ability to perform due to the [ ] repetitive necessity to gaze downwards and lift heavy objects." (Id.). Dr. Levine also stated that he had "completed a new status report" and as a result imposed new work restrictions on Plaintiff to not "gaze down on a repetitive basis" and to not "lift more than 2 lbs. on a repetitive basis and 5 lbs. on a dynamic basis." (Id.).

During 2005 (and apparently 2002), the U.S. Postal Inspection Service conducted surveillance on Plaintiff. (DSOF ¶ 3). The Postal Inspectors videotaped Plaintiff entering/exiting her car; driving her car; filling the tires of her car with air; cleaning her car; cradling a cell phone on both her left and right side between her neck and shoulder; carrying/cradling items in her arms; moving her head up, down, and sideways; pulling a trash can with her right hand; bending/twisting/stooping; and lifting/carrying items, all

movements without any visible sign of difficulty/discomfort. (Id., Exh. F, p.11; PCSOF, p.14).

On January 4, 2006, the Postal Inspectors sent Dr. Levine a letter and questionnaire, accompanied by a videotape of approximately sixteen minutes of Plaintiff's surveilled activities, to inquire into Plaintiff's "true work capabilities[.]" (DSOF, Exh. C, p.1). The letter noted that "[Plaintiff] is in a no work duty status based upon [Dr. Levine's] . . . . most current medical restrictions [dated August 29, 2005] . . . . [that] "[d]ue to medication [Plaintiff] is incapacitated an [sic] unable to work." (Id.). Dr. Levine apparently watched the videotape and then responded to the questionnaire, writing that based on the observed activities presented on the videotape, Plaintiff (1) went outside the restrictions he had placed on her, (2) "has painfree use of both arms & moves her cervical spine in an unrestricted fashion," and (3) could return to full time work for the Postal Service, without restrictions, "if this is a reflection of her functional ability[.]" (Id., pp. 2-3). Dr. Levine also noted that "[t]here is a discrepancy between [Plaintiff's] complaints of pain & the video surveillance." (Id., p.3).

On January 30, 2006, Plaintiff met with Dr. Levine and he informed her that "a video surveillance showed that she could perform all activities of daily living without any degree of pain[, and that] there was no indication as to why [he] would keep her out of work." (DSOF, Exh. E). Dr. Levine also "explained that [Plaintiff] should try to return to work and if in fact she developed pain once again [he] would then have to reevaluate her and perhaps set a second set of work restrictions at work." (Id.). The Postal Service subsequently terminated Plaintiff's employment for allegedly "misrepresenting her ability to work[.]" (DSOF ¶ 6).

Plaintiff filed a union grievance challenging her removal. (DSOF ¶ 7). But on September 3, 2007, the Arbitrator upheld Plaintiff's removal, concluding that "[t]he Postal Service has established that [Plaintiff] acted as charged: misrepresented her ability to work. Under the circumstances of this case, removal was reasonable and appropriate. [Plaintiff] has attempted to game more than one system by misrepresenting her ability to

work in order to collect compensation without having to work." (Id., Exh. F, p.1). The Arbitrator also remarked, after having first visited the GMF Facility, that "[i]t was clear that the nature of [Plaintiff's work] did not require 'continuous or repetitive gazing down' as claimed by [Plaintiff]." (Id., p.13).

On October 2, 2006, Plaintiff filed a complaint against the Postal Service in this Court, asserting claims for failure to accommodate under the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.; and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (Complaint, ¶¶ 68-82). The Postal Service filed a motion to dismiss Plaintiff's ADA claim on April 19, 2007 (Dkt. #13), to which Plaintiff filed a notice of non-opposition. (Dkt. #15). As such, the Court dismissed Plaintiff's ADA claim (Dkt. #16), and on October 15, 2008, the Postal Service filed the instant motion for summary judgment on Plaintiff's remaining claims under Title VII and the Rehabilitation Act. (Dkt. #49).[3]

## II. SUMMARY JUDGMENT

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." Diaz v. Eagle Produce Ltd. Partnership, 521

---

[3]Plaintiff also filed a motion to strike the Postal Service's objections to Plaintiff's Controverting Statement of Fact. (Dkt. #56). The Court, however, summarily denied the motion and construed it as a response to the Postal Service's objections per LRCiv 7.2(m)(2)'s admonition that "[a]n objection to the admission of evidence offered in support of or opposition to a motion must be presented . . . in the party's response to another party's separate statement of material facts[ ] and not in a separate motion to strike or other separate filing."

F.3d 1201, 1207 (9th Cir. 2008) (citing <u>United States v. Shumway</u>, 199 F.3d 1093, 1103-04 (9th Cir. 1999).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1076 (9th Cir. 2001). The moving party must present the basis for its motion and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. <u>See, e.g.</u>, <u>Nissan Fire & Marine Ins. Co. v. Fritz Co.</u>, 210 F.3d 1099, 1105 (9th Cir. 2000) ("A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence.").

If the moving party meets its burden with a properly supported motion for summary judgment, then the burden shifts to the non-moving party to present specific facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); <u>Matsushia Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986). The nonmovant may not rest on bare allegations or denials in his pleading, but must set forth specific facts, by affidavit or as otherwise provided by Rule 56, demonstrating a genuine issue for trial. Fed.R.Civ.P. 56(e); <u>accord</u> <u>Anderson</u>, 477 U.S. at 248-50; <u>see</u> <u>Block v. City of Los Angeles</u>, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of [Fed.R.Civ.P.] 56."). Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).

### III.    MOTION FOR SUMMARY JUDGMENT

The Postal Service moves for summary judgment on Plaintiff's remaining claims: (1) failure to accommodate Plaintiff's alleged disability in violation of the Rehabilitation Act, and (2) retaliation against Plaintiff for engaging in protected activities in violation of Title VII. (Dkt. #49, pp. 1, 5).

## A.    Discrimination & Failure to Accommodate

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).[4] Thus, "an employee bears the ultimate burden of proving that he is (1) disabled under the Act, (2) a 'qualified individual with a disability,' and (3) discriminated against 'because of' the disability." Bates v. United Parcel Service, Inc., 511 F.3d 974, 988 (9th Cir. 2007) (quoting Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999); see Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001) (same under section 504 of the Rehabilitation Act). The Postal Service disputes every element. (Dkt. #49, pp. 6-8).

### i. "Disabled under the Act."

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). As such, the ADA's applicability depends in part on whether the plaintiff's asserted impairment is a "disability" within the meaning of the Act; and this, in turn, depends on whether the asserted impairment "substantially limits one or more of the major life activities" of the plaintiff. 42 U.S.C. § 12102(1)(A). The definition of "disability" and "substantially limits" are to be broadly construed. Rohr v. Salt River Project Agricultural Imp. and Power Dist., 555 F.3d 850, 861 (9th Cir. 2009) (noting that

---

[4]Similarly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Therefore, because Title II of the ADA and section 504 of the Rehabilitation Act "create the same rights and obligations," the Court will refer to them interchangeably. Wong v. Regents of University of California, 410 F.3d 1052, 1055 n.1 (9th Cir. 2005).

the Americans with Disabilities Act Amendments Act of 2008, which became effective January 1, 2009, "expands the scope of the term 'disability' [and 'substantially limits'] under the ADA" and "rejects several Supreme Court decisions [to the extent] that [they] defined [those terms] . . . narrowly.").

"A 'major life activity' must be of 'comparative importance' and 'central to the life process itself,' and need not have a public, economic or daily character." Id. at 858 n.4 (quoting Fraser v. Goodale, 342 F.3d 1032, 1039 (9th Cir. 2003)). "Major life activities" include but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); see also 29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."). In addition, a person is substantially limited in these activities if she is "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). "The proper inquiry is whether the physical impairment substantially limits the claimed major life activity in daily life." Rohr, 555 F.3d at 858 n.5 (citation omitted).

"[W]hether a person has a disability under the ADA is an individualized inquiry." Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); see also Squibb v. Memorial Medical Center, 497 F.3d 775, 781 (7th Cir. 2007) ("Whether a particular impairment substantially limits a major life activity is a case-specific, individualized inquiry."). Thus, "[a]t the summary judgment stage, 'precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity. . . . Rather, . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact.'" Rohr, 555 F.3d at 858-59 (quoting Head v. Glacier Northwest Inc., 413 F.3d 1053, 1058 (9th Cir. 2005)). That being said, "[t]o survive summary

- 14 -

judgment, an affidavit supporting the existence of a disability must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment." Head, 413 F.3d at 1059.

Here, Plaintiff asserts that she is disabled because her "neck and shoulder impairment substantially limits her major life activities of *performing manual tasks* such as looking downward repetitively, lifting her arms above her shoulders and lifting more than five (5) pounds." (Dkt. #52, p.6) (emphasis added). Plaintiff also claims to be limited in her ability to walk, stand, and lift. (Id., p.7). To that, Defendant replies that the evidence "merely demonstrates that the Plaintiff had a series of different and temporary medical restrictions related to claims she made for on-the-job injuries and other medical conditions" (Dkt. #54, p.3), and that "Plaintiff's own physician has opined that the [she] does not suffer from any condition that limits her ability to work or perform activities of daily living" (id., p.4).

Plaintiff's neck and shoulder impairments originated from nerve damage that Plaintiff suffered during surgery in April 1996. At that time, the impairments and accompanying work restrictions were temporary. Then, after they persisted for one year, the Postal Service attempted to classify Plaintiff's restrictions as permanent; but Plaintiff challenged that classification, arguing that the evidence showed that her condition was temporary. Plaintiff also argued that by January 1998, she had completely recovered from her condition.

Nonetheless, the Postal Service apparently began treating Plaintiff's work restrictions as permanent in October 1999: "Employee has permanent restrictions since 4/28/97. No lifting over 20 lbs. No overhead reaching, lifting. No standing & doing repetitive flexion & extension of head." (PCSOF, Exh. 5).[5] Still, Plaintiff's work

---

[5]That is not to say, on the other hand, that the Postal Service regarded Plaintiff as being disabled, i.e., as having a physical impairment that substantially limits one or more of her major life activities. See Thompson, 121 F.3d at 541 ("[A]n employer's decision to terminate an employee 'based upon the physical restrictions imposed by [her] doctor . . . does

restrictions, as recommended by Dr. Levine, did not remain constant: her lifting restrictions consistently fluctuated from intermittent lifting of 20 pounds in October 1999 to 25 pounds in March 2001, 40 pounds in August 2001, 10 pounds in December 2002, between 5 and 10 pounds in February 2003, no restrictions in March 2005, 20 pounds in June 2005, and between 2 and 5 pounds in July 2005.  Plaintiff's other restrictions primarily involved avoiding activities that required "continuous or repetitive gazing down" and "repetitive overhead use of both extremities" (DSOF, Exh. F; PCSOF, Exh. 28); but those were also not constant: in January 2003, Dr. Levine, remarked that Plaintiff was "completely asymptomatic"; and in March 2005 he released her to full work, only to reinstate her work restrictions three months later and then again release her to full work in January 2006.[6]

Although it appears that Dr. Levine based these inconsistent work restrictions solely on Plaintiff's subjective complaints of pain / symptoms whenever she came in for an examination, there is insufficient evidence to support that conclusion at this time.  In addition, although Dr. Levine opined that Plaintiff could return to work without restrictions, after viewing the Postal Inspector's videotape of Plaintiff's surveilled activities, the videotape, as Dr. Levine noted, merely evidences a discrepancy between Plaintiff's subjective complaints of pain and her functional ability.  The videotape, simply shows Plaintiff, among other things, driving and cleaning her car, cradling a cell phone

not indicate that [the employer] regarded [her] as having a substantially limiting impairment.'") (quoting Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir. 1995)); Welsh v. City of Tulsa, Okl., 977 F.2d 1415, 1419 (10th Cir. 1992) ("[A]n impairment that an employer perceives as limiting an individual's ability to perform only one job is not a handicap under the [Rehabilitation] Act.").  To the contrary, the Postal Service's investigation and surveillance of Plaintiff's life activities to determine whether she was misrepresenting her medical restrictions, establishes that the Postal Service did not believe that Plaintiff was disabled.

[6]For these reasons, Plaintiff's contention that "[a]t no time did [her] restrictions change" (Dkt. #52, p.10) is not well taken; and Plaintiff's counsel would be well advised not to misrepresent the facts to the Court.

between her neck and shoulder, carrying what appear to be light-weight objects, all without visible signs of discomfort; but that is not necessarily inconsistent with Plaintiff's subjective complaints of pain or her consistently inconsistent restrictions on lifting and repetitive gazing down and overhead use of both extremities. As the Court must draw all inference in favor of Plaintiff, the nonmoving party, and may not make credibility determinations or weigh conflicting evidence, Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990), the Court assumes for purposes of summary judgment that Plaintiff's neck and shoulder impairment restricts / limits (1) her claimed major life activity of lifting, such that she can only lift between approximately 5 and 20 pounds, and (2) her claimed major life activity of performing manual tasks, such that she is unable to continuously and repetitively gaze down and is restricted in the continuous and repetitive overhead use of her arms.[7]

Nevertheless, the Court must also determine whether Plaintiff's presumed restrictions *substantially* limit her major life activities of performing manual tasks and lifting. First, although Plaintiff contends that her restrictions on gazing downwards and overhead use of her arms limit her ability to perform manual tasks, she fails to explain how or to what extent she is allegedly limited in performing manual tasks; and thus the Court cannot conclude that she is "significantly restricted as to the condition, manner or duration" in which she can perform manual tasks, as compared to the general population.

Second, it is undisputed that lesser lifting restrictions do not constitute impairments that substantially limit an individual's major life activities. See, e.g., Thompson v. Holy Family Hosp., 121 F.3d 537, 540-41 (9th Cir. 1997) (holding that a 25 pound lifting restriction does not substantially limit one's major life activities); Williams

_____

[7]The evidence does not similarly provide support for the brief reference in Plaintiff's response brief that she is substantially limited in her ability to walk, stand, kneel, squat, climb, or run. (Dkt. #52, p.7). Although Plaintiff was once restricted to "no sitting or standing over 30 minutes at a time" in March 2001, that restriction appears to have been temporary, as there are no subsequent, similar restrictions that the Court could glean from the record.

v. Channel Master Satellite Says., Inc., 101 F.3d 346, 349 (4th Cir. 1996) (same).  But as lifting is considered a major life activity under the ADA, see 42 U.S.C. § 12102(2)(A), the same cannot be said for greater lifting restrictions; and to that end, Plaintiff's presumed five to twenty pound lifting restriction, albeit in fluctuation and with an unknown duration, appears sufficiently more restrictive than a 25 pound restriction.  See Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996) (holding that a reasonable jury could conclude that a 15 pound lifting restriction constitutes a disability under the ADA); Martin v. Lockheed Martin Missiles & Space Co., 1998 U.S. Dist. LEXIS 4258, at *16-17 (N.D. Cal. 1998) (same for 10 pound restriction), aff'd 1999 U.S. App. LEXIS 15190, at *4-5 (9th Cir. 1999)).  Accordingly, drawing all reasonable inferences in her favor, Plaintiff has raised a genuine issue of material fact as to whether she is "significantly restricted as to the condition, manner or duration" in which she can lift, compared to the general population,[8] and thus whether she is "disabled" within the meaning of the ADA.  The Court must turn to whether Plaintiff is a "qualified individual with a disability."

ii. "Qualified individual with a disability."

"To state a claim of discrimination under the ADA, a plaintiff must establish that he or she is a 'qualified individual.'"  Rohr, 555 F.3d at 862 (citing 42 U.S.C. § 12112(a)).  A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment

---

[8]The Postal Service improperly conflates the major life activities of working and lifting.  Lifting restrictions may constitute a disability if they substantially impair an individual's major life activity of lifting, see Lowe, 87 F.3d at 1174 ("We hold that lifting is a major life activity and that the evidence creates a genuine issue of material fact with respect to whether [the plaintiff's] impairment substantially limits her ability to lift."); but they are not likely to constitute a substantial limitation on an individual's major life activity of work.  See Sarmento v. Henry Schein, Inc., 262 Fed.Appx. 26, 27 (9th Cir. 2007) ("We have previously determined that a lifting restriction impairing an employee's ability to work only one particular job is not 'substantially limiting' and therefore not a 'disability' under § 12102(2)(A).").  Here, Plaintiff does not contend that her restrictions constitute a substantial limitation on her ability to work.

position that such individual holds or desires." 42 U.S.C. § 12111(8). Here, the Postal Service argues that even if Plaintiff is disabled, she "could not perform the essential functions of her position" because "the essential duties of a mail processing clerk require the ability to perform repetitive activities with arms extended above the shoulders and heavy lifting." (Dkt. #49, p.6). Plaintiff responds that "[n]o where in the position description does it state that a mail processing clerk is required to lift a certain amount[,]" and that based on the stated job description, she can perform the essential duties of a mail processing clerk. (Dkt. #52, p.12).

Essential functions are the "fundamental job duties of the employment position . . . not including the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "Such evidence, however, is not conclusive: 'an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.'" Rohr, 555 F.3d at 864 (quoting Cripe v. City of San Jose, 261 F.3d 877, 887 (9th Cir. 2001)). Thus, "[w]here there is 'conflict in the evidence regarding the essential functions of [a position], we conclude that there is a factual dispute . . ., notwithstanding the job descriptions that [an employer] has prepared." Id. (quoting Cripe, 261 F.3d at 888- 89).

The position of mail processing clerk requires processing mail using automated processing equipment and manual methods of sortation and distribution. (PCSOF, Exh. 43). The position description lists duties such as sorting mail, loading mail onto automated equipment, monitoring the flow of mail, and sweeping mail from bins. (Id.).

But contrary to the Postal Service's unsupported assertion,[9] there is no stated requirement of heavy lifting and nothing specific with respect to performing tasks with arms extended above the shoulders. Nevertheless, as the Postal Service points out, "Plaintiff's entire case is based on her allegations that she had lifting [and neck / shoulder] restrictions that prevented her from performing her job duties without an accommodation." (Dkt. #54, p.5). Throughout the relevant time period, Plaintiff consistently requested light duty work and work "in a modified capacity" because her restrictions allegedly prevented her from performing her job duties, even when she was "completely asymptomatic." (PCSOF, Exh. 30). And the only job that Plaintiff asserts was within her restrictions was a data entry position; whereas "her former position [i.e., Mail Processing Clerk] "was not within her restrictions." (Dkt. #52, p.10). Thus, as Plaintiff appears to acknowledge, her alleged restrictions prevented her from performing the essential functions – sorting, loading, and monitoring mail – of a mail processing clerk.

But Court must also "determine whether [Plaintiff] has identified a reasonable accommodation that would have enabled [her] to perform the essential function[s]" of her job as a mail processing clerk. Haysman v. Food Lion, Inc., 893 F.Supp. 1092, 1102 (S.D. Ga. 1995). "Reasonable accommodations are mechanisms to remove barriers or provide assistance to disabled individuals so that they can perform the 'essential functions' of employment positions," Cripe, 261 F.3d at 889, and may include "job restructuring" or "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). However, ""[e]mployers are only required to make 'reasonable accommodations' that do not impose 'undue hardships' on them." Cripe, 261 F.3d at 885 n.6 (quoting 42 U.S.C. § 12112(b)(5)(A)).

The Postal Service argues that Plaintiff not only "fails to demonstrate that a reasonable accommodation was possible" (Dkt. #54, p.5), but that "the Postal Service

---

[9]The employer bears the burden of providing evidence of the essential functions of the ADA plaintiff's position. Bates v. United Parcel Service, Inc., 511 F.3d 974, 991 (9th Cir. 2007).

offered and provided reasonable accommodations" (id., p.6). Plaintiff, on the other hand, argues that she "requested accommodations to be able to work without being required to gaze down repetitively, reach above her shoulders and lift over five (5) pounds," but the Postal Service failed to provide such an accommodation or engage in an interactive process to identify and implement a reasonable accommodation, as required by the ADA. (Dkt. #52, pp. 10-11, 13-15). Plaintiff also argues that the Postal Service failed to offer her a modified position that "included duties of intermittent grasping; walking; standing; sitting . . . . [and] also provided an ergonomic workstation so [Plaintiff] would not have to gaze down repetitively." (Id., p.12).

However,, the modified mail processing clerk position that Plaintiff identifies is not within her alleged restrictions – it requires intermittent lifting of 0-15 pounds, 2-3 hours per day, and its duties are solely to monitor mail; it contains none of her original positions' essential functions of sorting and loading mail. (PCSOF, Exh. 44). See Haysman, 893 F.Supp. at 1102 ("[A]n employer is not required to waive an essential function of a job or to reallocate those functions.") (citing 29 C.F.R. Pt. 1630 App. § 1630.2(o)); Martin, 1998 U.S. Dist. LEXIS 4258, at *21 (same) (citing Wilmarth v. City of Santa Rosa, 945 F. Supp. 1271, 1278-79 (N.D. Cal. 1996)). Also, Plaintiff offers no indication that such a position was available or that it was significantly different from the "Offer of Modified Assignment (Limited Duty)" that Plaintiff accepted on August 10, 2004. (PCSOF, Exh. 37). Further, Dr. Levine advised Plaintiff that "the only true means of permanently alleviating her symptoms would be to change her job type with the postal service." (PCSOF, Exh. 32).

To that end, Plaintiff also argues that she should have been allowed to remain in the data entry position that she held prior to August 2004. (Dkt. #52, p.10). The data entry position, however, does not appear to be similar to or contain the essential functions of the position of mail processing clerk; especially since the vast majority of the functions of a mail processing clerk are functions other than data entry. (PCSOF, Exh. 43). Thus, Plaintiff appears to argue that the Postal Service had a duty to permanently reassign her to

a data entry position. But the Rehabilitation Act, unlike the ADA, does not contain "explicit language concerning the employer's duty to consider reassignment to a vacant position as a possible accommodation if the employee is no longer able to perform the essential functions of [her] original job." Haysman, 893 F.Supp. at 1104. And even if the Act did require an employer to consider reassignment to another position as a possible accommodation, Plaintiff fails to produce any admissible evidence indicating that a data entry position was available around August 2004.[10] See Haysman, 893 F.Supp. at 1105 (""The ADA says reassignment to a *vacant* position may be a reasonable accommodation. The ADA does not require that an employer 'bump' other employees, assign an individual to an occupied position or create a new position.") (citing 29 C.F.R. Pt. 1630, App. § 1630.2(o)) (emphasis added).

Finally, Plaintiff contends that the Postal Service failed "to engage in an 'informal, interactive process' to determine the appropriate reasonable accommodation" (Dkt. #52, p.13) (quoting 29 C.F.R. § 1630.9), and "failed to follow their own policy on how to provide a reasonable accommodation" (id., p. 14). But the Rehabilitation Act does not require that an employer comply with its internal policies. Smith v. Midland Brake, Inc., 138 F.3d 1304, 138 F.3d 1304, 1310 (10th Cir. 1998) ("Absent proof of discrimination as defined by the ADA, an employer's failure to follow its own internal policies does not in itself constitute a violation of the ADA.") (rev'd on other grounds, Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) (en banc)). The Act simply requires that

---

[10]Plaintiff states in her affidavit that "[o]n or about September 2004, Delores [sic] Crook filled the data entry position I previously held and worked in the position until her retirement." (PCSOF, Exh. 1 ¶ 19). However, Fed.R.Civ.P. 56(e) requires that "[a] declarant must show personal knowledge and competency to testify [as to] the facts stated. . . . [whereas] [a] declarant's mere assertions that he or she possesses personal knowledge and competency to testify are not sufficient." Boyd v. City of Oakland, 458 F.Supp.2d 1015, 1023 (N.D. Cal. 2006) (citations omitted). Plaintiff's statement is an assertion; there is no indication it is based on personal knowledge. See Haysman, 893 F.Supp. at 1105 ("There is nothing as to how Paul came to this 'understanding,' nor is there any other evidence whatsoever to support this hearsay.").

"[o]nce the employer knows of the disability and the desire for the accommodation, it has . . . to engage in the interactive process of designing a reasonable accommodation – the employer may not 'in the face of a request for accommodation, simply sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome.'"  Hodson v. Alpine Manor, Inc., 512 F.Supp.2d 373, 392 (W.D. Pa. 2007) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir. 1999)).  Plaintiff appears to recognize this, as she states that "the 'interactive process' is not a formalistic process."  (Dkt. #52, p.13).

Here, the Postal Service did not merely sit back and offer nothing – it permitted Plaintiff to work on light duty status within the restrictions imposed by her physicians for approximately six years; and then offered Plaintiff a permanent limited duty assignment within her restrictions after the data entry position she was temporarily assigned to in 2003 or 2004 was no longer available "due to operational needs and funding."  (DSOF, Exh. K).  The modified position was apparently approved (at least initially) by Dr. Levine as within Plaintiff's restrictions.[11]  (DSOF, Exh. K, p.3; DSOF, Exh. B ¶¶ 10, 11).  As such, the record discloses that the Postal Service attempted to accommodate Plaintiff so that she could continue performing her job as a mail processing clerk.  Simply because the accommodations, although within her restrictions, were not to Plaintiff's satisfaction, does not mean that the Postal Service did not attempt to accommodate her.  See Kimbro v. Atl. Richfield Co., 889 F.2d 869, 879 n.10 (9th Cir. 1989) ("[T]he fact that an accommodation ha[d] been attempted and was unsuccessful . . . [may] prove dispositive in determining whether failure to permit subsequent leave constituted failure to make a reasonable accommodation.").  Accordingly, Plaintiff fails to raise a genuine issue of

---

[11]On July 27, 2005, Dr. Levine reviewed some "work description, as of 2004," that Plaintiff provided to him, which required that Plaintiff "gaze downwards for a prolonged period of time . . . . and lift heavy objects."  (PCSOF, Exh. 41).  Plaintiff, however, fails to explain or identify which position Dr. Levine is referring to; and based on their descriptions, the Court cannot reasonably conclude that he was referring to the modified position. (PCSOF, Exhs. 37, 44).

material fact as to whether she is a "qualified individual with a disability," and thus fails to establish her prima facie case of disability discrimination under the Rehabilitation Act. The Court will grant summary judgment in favor of the Postal Service as to this claim.[12]

### B. Retaliation

"Section 704 of Title VII prohibits retaliation against an employee for opposing unlawful discrimination." McGinest v. GTE Service Corp., 360 F.3d 1103, 1124 (9th Cir. 2004) (citing 42 U.S.C. § 2000e-3(a) (2003)). And "like discrimination, retaliation may be shown using the McDonnell Douglas burden shifting framework." Id. Thus, "[i]n order to establish a prima facie case of retaliation, [a plaintiff] must demonstrate that (1) [she] had engaged in a protected activity; (2) [she] was thereafter subjected by her employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action." Porter v. California Dept. of Corrections, 419 F.3d 885, 894 (9th Cir. 2005) (citing Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000)); Seranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) ("[A] plaintiff alleging retaliation for the exercise of constitutionally protected rights must initially show that the protected conduct was a 'substantial' or 'motivating' factor in the defendant's decision.").

The proximity of time between a protected activity and an adverse action may support an inference of causation. Ray, 217 F.3d at 1244; Villarimo v. Aloha Island Air,

---

[12]The Postal Service also moved for summary judgment on whether Plaintiff was "[d]iscriminated against because of [her] disability." (Dkt. #49, p.7). Plaintiff, however, does not specifically respond to this section of the Postal Service's motion; perhaps because the Postal Service's discussion of this element concerns whether it offered Plaintiff a reasonable accommodation, which is part of the inquiry into whether Plaintiff is a "qualified individual," instead of discussing whether Plaintiff suffered a materially adverse change in the terms and conditions of her employment. See Ongsiako v. City of New York, 199 F.Supp.2d 180, 187 (S.D.N.Y. 2002) ("[A] plaintiff suffer[s] an adverse employment action if she endures a materially adverse change in the terms and conditions of employment.") (internal quotation marks and citations omitted). In any event, as Plaintiff fails to establish the second element of her prima face case under the Rehabilitation Act, the Court need not address this issue.

Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) ("[I]n order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression.") (internal quotation marks and citation omitted). However, "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Porter, 383 F.3d 1018, 1030 (9th Cir. 2004).

If the plaintiff provides sufficient evidence to show a prima facie case of retaliation, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. Porter, 419 F.3d at 894; Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982) (same). And if the employer sets forth such a reason, the burden shifts back to the plaintiff to prove the proffered reason is merely a pretext for an underlying retaliatory motive. Porter, 419 F.3d at 894.

Here, "[t]he Postal Service does not dispute that Plaintiff engaged in activity that is protected under Title VII." (Dkt. #49, p.5). It is unclear, however, exactly what the protected activity is that Plaintiff contends she engaged in. Plaintiff only generally references (1) "EEO[C] complaints," and in particular a March 18, 2003 EEOC claim (No. 350-2004-00147), which the Court is unable to locate in the record, and (2) "industrial claims," without explanation at to what those claims entail. (Dkt. #52, pp. 16-17).

Plaintiff contends that she was retaliated against between September 2002 and December 2002 when the Postal Service "(1) [c]hanged her hours, (2) forc[ed her into an assigned seat and isolat[ing] her from her co-workers, [and] (3) cut her work hours to two hours per day, . . . . [and ] (5) launched a 40 month investigation producing a 15 minute inflammatory overview in the form of a DVD[.]" (Dkt. #52, p.17). Plaintiff also contends that she was retaliated against in 2006 when the Postal Service "(6) [i]ntimated in a letter submitted to her doctor she could be committing fraud[,]" and in 2003 when the Postal Service "(4) gave her a position within her restriction only to return her to her

former position, claiming the position was to terminate.  The position did not terminate and is filled currently."  (Id.).

Plaintiff, however, points to no protected activity that she allegedly engaged in during 2002.  The only activities that the Court could glean from the record was Plaintiff's submission of medical documentation and requests for continued TLD assignment, which were all granted, and Plaintiff's December 2002 request for "time 'on the clock' to work on her EEO[C] complaint," presumably to complain about the changes made to her work hours.  (Dkt. #49, pp. 9-10).  The former activities, however, do not constitute "protected" activities.[13]  And the latter activity – the request for paid time to work on an EEOC complaint – even if it does constitute a protected activity (in addition to the complaint itself, which was apparently made in 2003), was also ultimately granted.  (Dkt. #49, p.10).  Plus, there is no evidence that any of Plaintiff's 2002 activities reasonably put Plaintiff's supervisors on notice that she was opposing disability discrimination; and no evidence whatsoever that the supervisors involved in her seating assignment, Denise Brown and Ginger Allen, were aware of any of Plaintiff's prior protected activities, such as her 1997 and 2001 EEOC complaints.  (Dkt. #50, Exh. G, p.91:20-25).  See Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 291-92 (2d Cir. 1998) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."); accord Lee v. Connecticut, 427 F. Supp. 2d 124, 134-35 (D. Conn. 2006); see also Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a

_____

[13]A "protected" activity is formal or informal opposition to unlawful discrimination, here disability discrimination, or any "charge, testifi[mony], assist[ance], or participat[ion] in any manner in an investigation, proceeding, or hearing [into unlawful discrimination]." 42 U.S.C. § 2000e-3(a).  See Ray, 217 F.3d at 1240 n.3 ("[F]iling a complaint with the EEOC is a protected activity.  Making an informal complaint to a supervisor is also a protected activity.") (citations omitted).

- 26 -

causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

In addition, Plaintiff's request for paid time to work on her EEOC complaint apparently occurred in late December 2002, only after the alleged retaliatory actions taken by her supervisors in 2002, and thus no causal link can be inferred between Plaintiff's subsequent request and her supervisor's prior actions. See Timmons v. United Parcel Service, Inc., 310 Fed.Appx. 973, 975 (9th Cir. 2009) ("UPS could not have retaliated against Timmons because the alleged adverse actions against Timmons took place before Timmons engaged in any protected activities."). On the other hand, it appears that Ron Heller, the supervisor who changed and limited Plaintiff's work hours, may have been aware of Plaintiff's prior EEOC activity, such as her 2001 complaint. (Dkt. #50, Exh. G). However, Plaintiff offers nothing to establish that a causal link existed between her 2001 EEOC complaint and the actions taken by Mr. Heller between September 2002 and December 2002. And despite Plaintiff's apparent assertion, the temporal proximity, or lack thereof, between Plaintiff's 2001 EEOC complaint and Mr. Heller's September-December 2002 actions is too attenuated to support an inference of causation. See McGinest, 360 F.3d at 1124 ("Because the two events were separated by a year and a half, the timing alone does not establish a connection, and McGinest does not offer any other explanation."). But see Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient evidence of causation existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge first investigated, and less than two months after investigation ended).

Likewise, Plaintiff's 2003 EEOC complaint, although it constitutes protected activity, cannot support Plaintiff's claim of retaliation. As stated above, protected activities that occur subsequent to alleged retaliatory acts cannot support a causal link between the protected activity and the adverse employment action, i.e., that Plaintiff engaged in a protected activity *and as a result* the employer took adverse action. See Timmons, 310 Fed.Appx. at 975.

Plaintiff, however, also points to post-2002 actions. In particular, Plaintiff contends that in 2003 the Postal Service assigned her to a position within her medical restrictions as a data processor only to subsequently return her to her former position – "a position not within her restrictions." (Dkt. #52, p.16). Plaintiff's 2003 EEOC claim, however, was apparently filed on March 18, 2003. (Id.). And she was allegedly "put into a data processing position within her limitation" in May 2003; and "was in the position for 15 months before being returned to her former position," in August 2004.[14] (Id.). Thus, Plaintiff apparently asks the Court to draw an inference of a causal link between Plaintiff's March 2003 EEOC claim and the Postal Service's decision to no longer allow her to remain in the data processing position in August 2004, despite the fact that Plaintiff was offered the position *after* she filed her March 2003 claim. That time line, however, does not provide circumstantial evidence of retaliation; and if anything supports only an inference that the Postal Service assigned her the position as a result of her protected activity, not that they took the position away because of such activity. But regardless, there is insufficient temporal proximity between Plaintiff's March 2003 EEOC complaint and the Postal Service's alleged adverse action in August 2004 to support an inference of causation.

Finally, the Court fails to see how either the Postal Inspector's surveillance of Plaintiff's activities outside of work or the fact that they showed the results of the surveillance to one of Plaintiff's physicians constitutes an adverse employment action. An adverse employment action is necessarily a disadvantageous change in the workplace. Ray, 217 F.3d at 1240. And the only adverse action, or change in the workplace, taken as a result of the Postal Inspector's surveillance was Plaintiff's termination in 2006. But Plaintiff does not challenge her 2006 termination in this action. Accordingly, the Postal

---

[14]Despite Plaintiff's assertion that she worked in the data entry position for approximately fifteen months, starting in May 2003, the record only indicates that Plaintiff worked in the position for approximately five months, between March and August of 2004. (DO, Exh. C; PCSOF, Exh. 37).

1    Inspector's surveillance and any accompanying actions cannot support Plaintiff's claim of

2    retaliation.

3           Even if Plaintiff could establish a prima facie case of retaliation, she fails to

4    establish that the Postal Service's legitimate, non-retaliatory reasons for its employment

5    decisions were actually a pretext for relation or discrimination.  See Pottenger v. Potlach

6    Corp., 329 F.3d 740, 746 (9th Cir. 2003) ("[Plaintiff] may establish pretext through

7    evidence showing that [the employer's] explanation is unworthy of belief or through

8    evidence showing that discrimination more likely motivated its decision.").  The Postal

9    Service asserts that "any changes in Plaintiff's hours were required by Plaintiff's medical

10   restrictions and the Postal Service's staffing needs[.]"  (Dkt. #54, p.8).  In response, the

11   most Plaintiff contends is that the Postal Service's assertion – specifically their assertion

12   that Plaintiff could no longer work in the data processing position because the position

13   was temporary and was to be terminated – amounts to pretext because Dolores Crooks, "a

14   co-worker[,] was placed in the data processing and continues to hold the position."  (Dkt.

15   #52, p.16; PCSOF ¶ 56).

16          Plaintiff, however, fails to submit any admissible evidence to support her

17   contention.  "A plaintiff may not defeat a defendant's motion for summary judgment

18   merely by denying the credibility of the defendant's proffered reason for the challenged

19   employment action.  Nor may a plaintiff create a genuine issue of material fact by relying

20   solely on the plaintiff's subjective belief that the challenged employment action was

21   unnecessary or unwarranted."  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018 n.6

22   (9th Cir. 2006).  Further, the Postal Service submits documentation which shows that

23   although Ms. Crooks received a limited duty assignment based on an injury she sustained

24   to her left hand, it was back in July 2002, not September 2004.  (DO, Exh. D).  Moreover,

25   the modified, limited duty assignment that the Postal Service offered to Plaintiff in

26   August 2004 (and again in September 2004), was approved by Plaintiff's treating

27   physician.  (DSOF, Exh. K, p.3; Exh. B ¶¶ 10, 11).  Thus, even if Plaintiff's contention

28   that Ms. Crooks was placed in a data processing position in September 2004 was

supported, it does not indicate that the Postal Service intended to discriminate against Plaintiff on the basis of her disability by reassigning or offering her a position other than a data entry position that was within her medical restrictions.  See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998) ("[Circumstantial] evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate . . . ").

Plaintiff not only fails to establish a prima facie case of retaliation (by not demonstrating any causal links between her protected activities and the alleged adverse action taken by the Postal Service), but fails to prove that the Postal Service's proffered reasons for its actions constitute a pretext for any discrimination or retaliation.  Plaintiff's retaliation claim must fail.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendant's Motion for Summary Judgment.  (Dkt. #49).

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment accordingly.

DATED this 29th day of September, 2009.

_____
Mary H. Murgula
United States District Judge